# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

KATHRYN L. HALL,

            Plaintiff,

v.                                        **MEMORANDUM OF LAW & ORDER**
                                          Civil File No. 13-3163 (MJD/BRT)


METROPOLITAN LIFE
INSURANCE COMPANY,

            Defendant.

Reed K. Mackenzie, Mackenzie Law Office, Counsel for Plaintiff.

William D. Hittler, Nilan Johnson Lewis PA, Counsel for Defendant.

## I.      INTRODUCTION

This matter is before the Court on the parties' cross-motions for summary judgment [Docket Nos. 13, 16] and Plaintiff's motion to strike certain footnotes in Defendant's brief [Docket No. 28].  The Court heard oral argument on June 5, 2015.  Because MetLife violated its duty under ERISA to provide Plaintiff with the opportunity for a full and fair review, the Court remands this matter to MetLife for further proceedings consistent with this opinion.

## II.     BACKGROUND

Plaintiff Kathryn Hall ("Plaintiff") brings this action based on Defendant Metropolitan Life Insurance Company's ("MetLife") denial of accidental death and dismemberment benefits after the death of Plaintiff's husband, James Hall ("Hall").

## A.     Factual Background

The following is a summary of the facts as set forth in the Administrative Record.[1]

### 1.     The Plan

At all relevant times, Hall was an employee of Textron, Inc. ("Textron"). (ML 268-69.)  The Textron Inc. Insured Benefits Plan ("Plan") is an employee welfare benefit plan regulated by the Employment Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq. ("ERISA").  (ML 180-247.)   The Plan provides basic life and accidental death and dismemberment benefits.  (ML 243.)

Textron is the Plan Administrator.  (ML 243.)  MetLife serves as the Plan's claims fiduciary.  (ML 243-45.)   The Plan grants MetLife the discretionary authority to interpret the Plan and to determine eligibility for and entitlement to Plan benefits:

---

[1] Attached as Exhibit A to the Affidavit of William D. Hittler.  [Docket No. 15] Citations to the Administrative Record are in the following format: ML XXX.

> In carrying out their respective responsibilities under the Plan, the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan.  Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

(ML 245.)

The Plan provides accidental death and dismemberment benefits for "an accidental injury that is the Direct and Sole Cause of a Covered Loss."  (ML 230.) "Direct and Sole Cause" is a "Covered loss [that] occurs within 12 months of the date of the accidental injury and was a direct result of the accidental injury, independent of other causes."  (Id.)   The Plan contains the following relevant exclusions:

> We will not pay benefits under this section for any loss caused or contributed to by:
>
> 1.  physical or mental illness or infirmity, or the diagnosis or treatment of such illness or infirmity;
>
> . . .
>
> 8.  the voluntary intake or use by any means of:
>     - alcohol in combination with any drug, medication, or sedative

(ML 230.)

Hall designated his wife, Plaintiff, as the primary beneficiary of his accidental death and dismemberment coverage.  (ML 283-84, 289, 293.)  Based on the coverage paid by Textron and the additional coverage paid by Hall, the Plan provided a total of $794,000 in benefits in the event of accidental death.  (ML 269.)  (The Plan additionally provided $294,000 in basic life insurance benefits.  (Id.))

### 2.   Hall

#### a)   Medical History

Hall had a history of atrial fibrillation, coronary artery disease, and prior bypass surgery, among other medical conditions.  (ML 249-50**.**)

On April 16, 2010, Hall had an appointment with Alyssa Muellner, PA, at the Metropolitan Heart and Vascular Institute.  (ML 248-53.)  According to Muellner's notes, in February 2010, Hall discussed a cardioversion procedure with Paul Finstad.  (ML 250.)  As of the April 16 visit, Hall was taking Coumadin, an anticoagulant or blood thinner, in preparation for the cardioversion procedure.  (Id.)  The records further state that Hall suffered from "[p]ersistent atrial fibrillation" and:

> is on antiarrhythmic therapy with amiodarone and has been therapeutic with his Coumadin.  Therefore, we will schedule a cardioversion for early next week.  Will then plan to see the patient

4

back in the clinic about a month after the cardioversion to reevaluate
his rhythm.

(ML 251.)

On June 10, 2010, Hall had a checkup with Ronald Diorio, PA.  (ML 254-

259.)  Diorio's notes confirm that Hall's cardioversion was completed on April

19, 2010.  (ML 254.)  About one month after the cardioversion, Hall reported that

he discontinued use of Amiodarone and Coumadin (warfarin).  (ML 255, 257.)

Hall and Diorio "had a long discussion regarding pathophysiology of atrial

fibrillation, especially stroke risk."  (ML 255.)  Hall was ordered to stop taking

warfarin (Coumadin).  (ML 258.)  His heart was still in sinus rhythm.  (ML 255.)

On October 15, 2010, Hall had an appointment with cardiologist Dr. Mark

Kraemer to review the results of an EKG.  (ML 260-65.)  Kraemer noted in his

patient history that Hall had "a follow-up echo" on July 26, 2010 and "it looks

like [Hall] probably was in atrial fibrillation at the time."  (ML 261.)  Kraemer

also remarked that Hall "has been on aspirin a day since he stopped the

Coumadin in April."  (Id.)  Kraemer noted that Hall had "[p]revious significant

alcohol intake" and "[r]ecurrent atrial fibrillation, seemingly well-tolerated."

(ML 262.)  During the appointment, Kraemer "discussed atrial fibrillation and

that [Hall] is minimally symptomatic." (Id.)  Kramer made the following

notation:

> Discussed the option of just placing him back on Coumadin and
> using rate control.  [Hall] seems to be tolerating it well.  After
> extensive discussion of that option, [Hall] really would prefer to be
> back in sinus rhythm and wants to try cardioversion again as he is
> worried about the long term effects of atrial fibrillation.  Discussed
> how that would require putting him back on Amiodarone and
> Coumadin.  He is willing to try that.  Will start back on Amiodarone
> 200 a day as well as his previous dose of Coumadin and get an INR
> follow-up appointment in next 3-4 days.
>
> * * *
>
> [] Anticipate cardioversion, maybe 6-8 weeks from now.
>
> [] If he ultimately does revert back to atrial fibrillation and does not
> wish to take Coumadin, which I think is quite likely based on what
> he has done in the past, might consider a baby aspirin and Plavix as
> an alternative regimen. . . .
>
> * * *
>
> [D]iscussed that he is at significant risk for sudden death based on
> factors noted above.

(ML 262-63.)  Hall was instructed to resume taking Coumadin.  (ML 265.)

### b)    Death

When Plaintiff returned home from a trip on November 1, 2010, she

discovered Hall lying on the floor, surrounded by a pool of blood and cold to the

touch.  (ML 278.)  Hall was 62 years old.  (ML 300.)

Plaintiff called police to the scene, where they

> observed numerous blood drops on the floor from the dining room going into the kitchen.  The upper level had a center island that separated the kitchen from the dining room and living room.  Laying on the floor in the dining room was the victim who had been covered with a blanket. . . . His head was resting on the upper part of an overturned chair . . . .  There was another overturned dining room chair on the west side of the victim.  There was what appeared to be a massive amount of dried blood all over the floor on the west side of the center island[.]  There was also dried blood going up the side of the center island cabinets approximately 24 inches. . . .

> * * *

> The blanket was removed from the victim and it was found that he was covered in dried blood from head to toe.

(ML 281.)  The officers pronounced Hall DOA.  (ML 279.)

Plaintiff told the police that Hall "had a heart condition" and "surgery about a year ago."  (ML 279.)  He was "currently taking [Coumadin] as he was in the process of having his heart 'shocked' [due] to his condition."  (Id.)  She also stated that Hall had a history of atrial fibrillation.  (Id.)  The police found several of Plaintiff's medications, including Coumadin, on the kitchen counter.  (Id.)

### c)      Autopsy Results and Death Certificate

On November 2, 2010, Michael McGee, M.D., Ramsey County Medical Examiner, conducted an autopsy.  (ML 282, 300.)  McGee discovered a scalp laceration in Hall's occipital region measuring 4.5 centimeters (approximately 1.8

inches) in length with a pronounced soft tissue hemorrhage in the surrounding area, along with abrasions on his knees, lower forehead, and elbows.  (ML 282, 303-04.)  McGee identified five provisional diagnoses, including: (1) exsanguination associated with fall resulting in scalp laceration; (2) atherosclerotic heart disease with 100% occlusion of the left anterior descending coronary artery; (3) cardiomegaly (enlarged heart); (4) "[c]urrent Coumadin therapy;" and (5) chronic alcoholism.  (ML 309.)  Laboratory results were pending.  (Id.)

Based on McGee's findings, the Death Certificate, filed on November 5, 2010, lists "cause of death" as follows: "immediate:" "exsanguination;" "underlying:" "laceration to scalp; fall;" and "other contributing conditions:" "Coumadin therapy; status post coronary artery bypass."  (ML 270.)  The death was ruled an accident.  (Id.)

The Final Autopsy Report was signed on November 22, 2010.  (ML 300.)  It confirmed the provisional diagnosis.  (Id.)  It also indicated that, based on toxicology results, Hall's blood alcohol level at time of death was .20.  (Id.)

### 3. Plaintiff's Claim for Benefits Under the Plan

#### a) Initial Claim

Plaintiff transmitted a Life Insurance Claim Form Claimant's Statement to Textron on December 15, 2010.  (ML 273-74.)  Hall's daughter, Candice Hall, also sent a Life Insurance Claim Form Claimant's Statement to Textron, with a copy of the Death Certificate.  (ML 270-72.)

On December 29, 2010, Textron submitted an Employer's Statement to MetLife, confirming the amount of Hall's benefits, and other documents, including the Death Certificate and police reports.  (ML 293.)   Among the documents sent to MetLife was a representation by Textron that: "Death was due to an accident in the home."  (ML 290.)

On January 4, 2011, MetLife determined it would pay the claims for Basic Plan Benefits, but would need additional information before determining coverage for accidental death benefits.  (ML 178.)  By letters dated January 4 and 5, 2011, MetLife asked Plaintiff to provide copies of the Autopsy Report, a toxicology report, Hall's medical records and any medications that were prescribed, dosages, and the reasons for treatment.  (ML 60, 295-96, 299.)

On January 6, 2011, MetLife paid Basic Plan Benefits to Plaintiff and Candice Hall.  (ML 267.)

                **b)**     **MetLife's Request for Additional Records and Extension of Time**

Plaintiff sent the Final Autopsy Report to MetLife on January 28, 2011. (ML 300-10.)  On February 4, MetLife again asked Plaintiff to provide a copy of a toxicology report and stated it would need up to an additional 90 days to complete its determination of her claim because it did not have that report.  (ML 61.)  A week later, on February 11, MetLife again contacted Plaintiff to obtain Hall's medical records, including prescribed medications, dosages, and the reason for treatment.  (ML 311.)  Plaintiff called MetLife on February 22 and explained she had not received its letters yet because her mail was being forwarded to Texas where she was staying with her daughter, but agreed to provide the requested documents.  (ML 152.)  On March 30, Plaintiff contacted MetLife again and advised that the records would be forthcoming.  (ML 148.) MetLife extended the time for its consideration of her claim by an additional 30 days.  (ML 147.)

MetLife received Hall's medical records on April 6, 2011.  (ML 145, 248-65.)

### c)    Referral to Dr. Bailey

In light of the medical records, on April 14, 2011, MetLife referred Plaintiff's claim to its Medical Director, Dr. Derrick Bailey, to determine if an otherwise healthy person would have died from such a scalp laceration, whether alcohol in combination with another drug contributed to Hall's death, and

whether Coumadin contributed to Hall's death.  (ML 1-6; Casey Aff. ¶ 5.)  Bailey

was provided copies of the Death Certificate, police Incident Reports, the Final

Autopsy Report, and the medical records produced by Plaintiff.  (Casey Aff. ¶ 6.)

     In his May 16, 2011 response, Bailey opined that it was "[u]nlikely that an

otherwise healthy person would have exsanguinated as [Hall] did.  The severity

of his bleeding was likely from Coumadin."  (ML 9.)  He further concluded that,

within a reasonable degree of medical certainty, Hall's death was caused or

contributed to by a physical illness or the treatment for such illness, or alcohol in

combination with any drug, medication, or sedative.  (ML 10.)   He remarked

that Hall's alcohol was 0.2 "which is legal intoxication," and "[s]everity of

bleeding is likely secondary to Coumadin."  (Id.)  When asked if the medical

records showed, to a reasonable degree of medical certainty, that a medical

condition caused or contributed to Hall's death, Bailey noted "[i]t is possible, he

had 100 percent occlusion of a major coronary artery."  (Id.)  Finally, when asked

if Coumadin contributed to Hall's death, he opined that Coumadin "[v]ery likely

contributed to the severity of the bleeding from the wound."  (Id.)

### d)     Initial Denial of Benefits

     Based on Bailey's opinion, a MetLife Claims Department representative

initially flagged two Plan exclusions: the first exclusion, "physical or mental

illness or infirmity, or the diagnosis or treatment of such illness or infirmity,"

and the eighth exclusion, "the voluntary intake or use by any means of . . .

alcohol in combination with any drug, medication, or sedative." (ML 11-12.)  A

reviewing senior decided that the denial should be based on the "treatment of an

illness" exclusion only. (ML 13, 135.)

By letter dated May 23, 2011, MetLife denied Plaintiff's claim for accidental

death benefits under the Plan. (ML 14-15.)  MetLife applied only the first

exclusion as basis for its denial.  It explained:

> According to our records, the Minnesota State Death Certificate
> indicates that James' cause of death was due to "Exsanguination"
> caused by "Laceration to scalp; fall."  The Death Certificate also lists
> other contributing conditions as "Coumadin Therapy, status post
> coronary artery bypass."  The Office of the Medical Examiner final
> Autopsy Report indicates Mr. Hall had Atherosclerotic heart
> disease, 100% occlusion of the left anterior descending coronary
> artery and current coumadin therapy.  Medical records provided
> from Alyssa Muellner, PA show a history of atrial fibrillation,
> hypertension, ischemic cardiomyopathy and coronary artery
> disease.  One of the treatments for these conditions is Coumadin
> therapy or anticoagulation therapy.
>
> As the immediate cause of death, exsanguination or extensive loss of
> blood was contributed to by the coumadin therapy, treatment for
> Mr. Hall[']s medical conditions, payment of Accidental Death and
> Dismemberment benefits is specifically excluded under the terms of
> the Plan.

> Therefore, based on the record before MetLife, we must deny your
> claim.

(ML 15.)  The letter did not mention that MetLife had obtained and relied upon a

medical opinion regarding the effect of Coumadin on Hall's death.  MetLife

informed Plaintiff she had sixty days to appeal the denial.  (Id.)  It also informed

her that, upon written request, it would provide her with a copy of records and

reports relevant to her claim.  (Id.)

### e)   First Appeal

On June 13, 2011, Plaintiff spoke to a MetLife representative.  The

conversation was documented by MetLife as follows:

> Kathryn called in questi[o]ning the denial.  She adv James was
> taking Coumadin.  I adv her if she wishes to appeal claim to put it in
> writing and to send her appeal to the address that was mentioned in
> the denail [sic] letter.  She said she will do so[.]

(ML 131.)

By a pro se letter dated June 27, 2011, Plaintiff formally appealed.  (ML 16-

21.)  Plaintiff asserted:

> My husband . . . did not die from Atherosclerotic heart disease, 100%
> occlusion of the left anterior descending coronary artery, atrial
> fibrillation, hypertension, ischemic cardiomyopathy, or coronary
> heart disease!  He was not being treated with Coumadin therapy for
> a condition, but, for an upcoming CARDIOVERSION procedure,
> scheduled sometime in November, 2010.

(ML 18.)

In the letter, Plaintiff also contended that the Final Autopsy Report stated

that Hall's scalp laceration:

> occurred in the "occipital" region of the scalp where there are
> numerous blood vessels and nerves, thus, resulting in profuse
> hemorrhaging.
>
> The immediate cause of death was "EXSANGUINATION"
> associated with fall, just as Dr. McGhee reported in the FINAL
> ANATOMIC DIAGNOSIS!!

(ML 20.)

In a written postscript, Plaintiff cited the Plan's exclusion for loss

contributed by voluntary intake or use of any drug or medication, "unless it is:

taken or used as prescribed by a physician."  (ML 20.)  She noted that Kraemer

prescribed the Coumadin for Hall's upcoming cardioversion, and argued:

> My husband did not die of a physical or mental infirmity, or
> treatment of such!  He died from falling and hitting his head which
> resulted in a very large laceration in length & depth in his scalp.  It
> seems very strange to me that you are basing your denial on medical
> records from April, 2010, by a "P.A." and not his doctor whom he
> last saw in October, 2010, prior to his death on November 1, 2010.
>
> . . .  My Husband's death had nothing to do with any of his medical
> conditions!  It was an accident!  That is exactly the reason you have
> "accidental death" insurance!
>
> * * *

14

> This claim has definitely been improperly denied!  There is more
> than substantial evidence to prove it!
>
> Perhaps you need to look at the medical examiner's report again,
> along with Dr. Mark Kraemer's report.

(ML 20-21 (emphasis in original).)

### f)       Second Referral to Bailey

In an internal response to Plaintiff's appeal, MetLife noted "plan does have Alcohol with drugs exclusion that was not addressed in denial.  Should send to medical to have Dr elaborate on the effect of .2% BAC with the coumadin."  (ML 118.)

MetLife sought a follow-up opinion from Bailey to assess the effects of the alcohol in combination with the Coumadin, to see if the Coumadin alone was enough to contribute to the death, and to determine to what level the alcohol contributed to Hall's death.  (ML 26-27.)  Baily responded to the August 1, 2011, request by fax dated August 9, 2011.  (ML 28-31.)  He offered the following conclusions:

> <u>What are the effects of the Alcohol with the Coumadin?</u>
>
> Alcohol causes platelets to be less sticky and also may decrease the
> number of platelets, resulting in increasing bleeding tendency.  Thus
> alcohol may increase the bleeding tendency of Coumadin.

#3

<u>Was the Coumadin alone enough to contribute to the death?</u>

I cannot say for sure.  However, Coumadin would likely increase the tendency for bleeding thus causing more bleeding than if it was not present.

#4

What effect of the level of alcohol at .2%BAC contribute to the death?

That level is in the legal intoxication range.  It would likely impair the ability of the deceased to seek help if he was not incapacitated by the head injury alone.

(ML 30-31.)

### g)      Denial of First Appeal

In light of Bailey's new conclusions, an internal MetLife document noted:

Plan has an exclusion for alcohol in combination with any drug or medicine.  Agree to deny on this exclusion as the alcohol in combination with the coumadin increased the bleeding and contributed to the death.  We can also use the treatment of illness exclusion based on the effects the coumadin had.

(ML 33.)  A Senior Referral Form noted: "per the medical referral that is

som[e]what vague suggest advisement if the denail [sic] is defensible in court."

(ML 34.)  The senior reviewer ultimately concluded: "We can uphold our denial

based on the treatment of illness due to the effects coumadin would have on the

bleed.  In addition, we should be using the drugs in combination with alcohol exclusion, therefore, we will need to give additional appeal rights."  (ML 35.)

By letter dated August 17, 2011, MetLife upheld its initial denial based on the first exclusion.  (ML 36-38.)  It affirmed that the Plan does not cover loss caused or contributed to by treatment of illness or infirmity, and opined that Hall's death was caused or contributed to by illness and treatment of an illness, including Coumadin therapy.  (ML 37.)  It listed the same evidence that it had listed in the initial denial letter and did not mention the first or second Bailey opinions.  (Id.)

MetLife also offered an alternative basis for denial, under the eighth exclusion for "voluntary intake or use by any means of . . . alcohol in combination with any drug, medication or sedative."  (Id.)  It concluded that based on the autopsy report, Hall "was consuming alcohol in combination with drugs."  (Id.)  The letter did not mention Bailey's opinion on the matter.  (Id.)  It did indicate that Plaintiff had 60 days to appeal and could obtain a copy of relevant records upon written request.  (Id.)

### h) Second Appeal

On October 11, 2011, Plaintiff called MetLife, who documented the call as follows:

> Kathryn called and she stated that she doesn't want to appeal the
> second time. She is going to do the civil suit. She wants a defin[i]te
> answer as to whether she has to do the appeal this time or can she
> just do a civil suit. Sent email to team to find out whether or not she
> has to appeal the second time or if she can just file a civil suit.

(ML 104.) On October 12, 2011, MetLife described a second conversation with

Plaintiff: "called very upset sates [sic] she is done appealing our denials as we

keep telling her the same thing." (ML 98.)

On October 13, Plaintiff wrote to MetLife, alleging that, in its August 17

letter, MetLife did not mention the new information that she had provided with

her appeal, and threatening to commence a civil action. (ML 39.)

### i)    Second Denial/Denial of Second Appeal

Upon receipt of Plaintiff's October 13 letter, a MetLife representative made

the following internal remark:

> We need to draft a new initial denial letter this is what should have
> been done in August via the letter that was sent out 8/17/11. We
> sent it as an uphold w/new erisa appeal rights we need to explain
> it's a new initial denial w/ new appeal rights & that it was based of
> the review of her initial appeal w/ the records she supplied.

(ML 42.)

MetLife sent Plaintiff another letter on October 25, 2011, described as "a

new denial letter with new appeal rights." (ML 43-44.) The letter identified the

first and eighth exclusions as grounds for denial. (ML 44.) It cited to the same

18

evidence as the previous letters and did not mention Bailey's opinions.  (<u>Id.</u>)  As

an explanation for its denial, MetLife stated:

> According to the autopsy report, the BAC for the insured was 0.20
> indicating he was voluntarily using alcohol in combination with any
> drug, medication or sedative.
>
> As the immediate cause of death, exsanguination or extensive loss of
> blood was contributed to by the coumadin therapy, treatment for
> Mr. Hall[']s medical conditions, payment of Accidental Death and
> Dismemberment benefits is specifically excluded under the terms of
> the Plan.
>
> Therefore, based on the record before MetLife, we must deny your
> claim.

(<u>Id.</u>)

### j)     Third Appeal

On December 15, 2011, Plaintiff again appealed.  (ML 45.)  She stated:

> I stand by my original letter of appeal, dated June 27, 2011, in which
> you were given additional information as to why I feel this claim
> was improperly denied, which to date, you have not addressed  . . . .
> . THE SEVERITY OF THE LACERATION TO HIS SCALP . . . . until
> such time you address that issue, I will continue to believe that you
> have improperly denied this claim!!
>
> You also mention nothing of my letter dated, October 13, 2011!

(ML 45 (ellipses in original).)

### k)     Third Denial and Clarification of Position

On December 30, 2011, an internal MetLife reviewer offered the following

analysis of Plaintiff's claim and appeal:

> Denied based upon alcohol with drugs exclusion.  Injury to scalp
> did not appear to be life threatening on its own and was not the sole
> cause of loss.  Contributed to the coumadin with alcohol which led
> to excessive blood loss.

(ML 52.)

By letter dated January 3, 2012, MetLife upheld its denial.   (ML 53-54.)

This letter only identified the eighth exclusion, alcohol in combination with any

drug.  (Id.)  It continued:

> To clarify MetLife's position, upon further review, there was a
> laceration to his scalp and was contributing factor.  However, there
> is no evidence that this wound of and by itself was life threatening
> and would have solely caused his death.  As Mr. Hall was taking
> coumadin for an upcoming procedure and was consuming alcohol
> to an excessive level, this reasonably effected [sic] his ability to stop
> bleeding and was the cause of the excessive blood loss.
>
> * * *
>
> Mr. Hall had consumed alcohol in combination with any drug,
> medication, or sedative.  Therefore, the payment of Accidental
> Death and Dismemberment benefits are specifically excluded under
> the terms of the Plan.  Again to clarify MetLife's position, the
> laceration to the scalp was not the sole cause of death and evidence
> that this would alone caused [sic] his death has not been presented.
> The medical information presented shows his death was due to
> excessive blood loss and that is directly linked to use of coumadin

20

and consumption of alcohol which would have inhibited his ability
to stop such bleeding.

(ML 54.)  The letter informed Plaintiff that she had the right to file a civil action

and noted that she was "entitled to receive, upon request and free of charge,

reasonable access to, and copies of, all documents, records, and other

information relevant to the claim for benefits."  (Id.)

### l)      Request for the Administrative Record

On June 20, 2012, Plaintiff requested a copy of the MetLife administrative

claim file.  (ML 55.)  MetLife sent the file to Plaintiff on July 2, 2012.  (ML 59.)

### B.      Procedural Background

Plaintiff filed a Complaint against MetLife in this Court on November 18,

2013.  [Docket No. 1]  It alleges that the denial of Plaintiff's claim for benefits was

wrongful and contrary to the terms of the applicable insurance policies and law.

(Compl. ¶ 6.)  Plaintiff seeks: (1) to recover benefits due under the terms of the

Plan under 29 U.S.C. § 1132(a)(1)(B); (2) to obtain injunctive relief to recover

benefits due and compel payment benefits under 29 U.S.C. § 1132(a)(3)(B); (3) to

require Defendant as a fiduciary to discharge its statutory duties under 29 U.S.C.

§ 1104(a)(1)(A), (B); (4) for equitable and remedial relief as provided in 29 U.S.C.

§ 1109(a); and (5) attorneys' fees and costs.  (Id.)

The parties have now filed cross-motions for summary judgment. [Docket Nos. 13, 16] Plaintiff has also filed a motion to strike certain footnotes in Defendant's Memorandum in Support of Defendant's Motion for Summary Judgment [Docket No. 20] on the grounds that they contain medical evidence that is not present in the administrative record and was not disclosed by Defendant during the administrative proceedings. [Docket No. 28]

## III.    MOTION TO STRIKE

Plaintiff moves to strike MetLife's citation to various external references (primarily online dictionaries and references like webmd.com and the U.S. National Library of Medicine) for definitions of medical conditions and medications. (See [Docket No. 20] MetLife's Memorandum in Support of Motion for Summary Judgment, footnotes 5, 6, 9, 12, 14, 16, 24, 26.) None of these resources, Plaintiff contends, were disclosed in the administrative record or relied on by MetLife in its insurance determination.

"Generally a reviewing court must focus on the evidence available to the plan administrators at the time of their decision and may not admit new evidence or consider post hoc rationales." Waldoch v. Medtronic, Inc., 757 F.3d 822, 829-30 (8th Cir. 2014) (citation omitted).

Other than footnote 24 and the second and third sentences in footnote 5, the citations provide general definitions of medical terms used in the case based on online resources, such as online dictionaries, webmd, and the National Library of Medicine.  The definitions are not material to the decision of whether Plaintiff's claim should have been granted, but rather, provide the context for the Court to understand the terms used in the medical records.  It is appropriate for the Court to take judicial notice of these uncontested definitions of these medical terms.  See N.Y. Life Ins. Co. v. Calhoun, 97 F.2d 896, 898 (8th Cir. 1938) ("Since this pivotal word is not defined either in the policy or the application it is permissible for the court to take judicial notice of its meaning as given in standard works such as dictionaries.").  Plaintiff's motion is denied with respect to the first sentence of footnote 5 and with respect to footnotes 6, 9, 12, 14, 16, and 26.

On the other hand, the second and third sentences in footnote five provide: "Warfarin [Coumadin] may cause severe bleeding that can be life-threatening and even cause death. . . . Warfarin prevents blood from clotting so it may take longer than usual for you to stop bleeding if you are cut or injured. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682277.html (last visited

September 23, 2014)."  These statements appear to be an attempt to bolster

Bailey's medical opinion that Hall's use of Coumadin contributed to his death by

causing him to bleed excessively from his head wound.

Footnote 24 provides: "At an estimated .20 blood alcohol content, a person

may have trouble walking and double vision depending on body weight and

other factors. http://www.webmd.com/mentalhealth/addiction/ blood-

alcohol?page=2 (last visited September 23, 2014)."  This statement appears to be

an attempt to bolster Bailey's medical opinion that Hall's use of alcohol

contributed to his death by impairing his ability to go get help after his fall.

Because the opinions set forth in footnote 24 and in the second and third

sentences in footnote 5 are material to the question of whether MetLife's decision

should be upheld and they are not in the administrative record, the Court will

disregard them.

## IV.    MOTIONS FOR SUMMARY JUDGMENT

### A.    Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case."  Amini v. City of Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

## B.    Applicable Standard of Review

### 1.    Abuse of Discretion

A "denial of benefits challenged under [ERISA] is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  "If the plan grants such discretionary authority, then the plan administrator's decision is reviewed for abuse of discretion."  Waldoch v. Medtronic, Inc., 757 F.3d 822, 829 (8th Cir. 2014) (citation omitted).  The Plan gives MetLife "discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan."  (ML 245.)  Thus, as the parties agree, the Court must apply the abuse of discretion standard.

"Under the abuse of discretion standard, the court must affirm the plan administrator's interpretation of the plan unless it is arbitrary and capricious." Manning v. Am. Republic Ins. Co., 604 F.3d 1030, 1038 (8th Cir. 2010).

> To determine whether a plan administrator's decision was arbitrary and capricious, the court examines whether the decision was reasonable. Any reasonable decision will stand, even if the court would interpret the language differently as an original matter.

Id. (citations omitted). Under this standard, the Court "must affirm if a reasonable person could have reached a similar decision, given the evidence before him, not that a reasonable person would have reached that decision." Prezioso v. Prudential Ins. Co. of Am., 748 F.3d 797, 805 (8th Cir. 2014) (citation omitted). The decision must be supported by substantial evidence, which means "more than a scintilla but less than preponderance." Gorvik v. Unum Life Ins. Co. of Am., 702 F.3d 1103, 1109 (8th Cir. 2013) (citation omitted). "Generally a reviewing court must focus on the evidence available to the plan administrators at the time of their decision and may not admit new evidence or consider post hoc rationales." Waldoch, 757 F.3d at 829-30 (citation omitted).

### 2.   Conflict of Interest

Where a claim fiduciary both evaluates claims for benefits and pays benefit claims, an inherent conflict of interest exists. See Manning, 604 F.3d at 1038. The

Court should consider the conflict of interest "as a factor in determining whether the plan administrator has abused its discretion in denying benefits." Id. at 1038-39.

> The significance of this factor depends on the circumstances of the particular case. When an insurer has a history of biased claims administration, the conflict may be given substantial weight. When an insurer has taken steps to reduce the risk that the conflict will affect eligibility determinations, the conflict should be given much less weight.

Id. at 1039 (citations omitted).

Here, the Court will give a moderate amount of weight to the structural conflict of interest affecting MetLife as both the entity that decides claims and the entity that pays claims. This factor carries more than minimal significance based on a number of circumstances. First, the Court weighs the conflict of interest more heavily than usual because MetLife relied on an employee medical doctor in denying the claim. As a MetLife employee, Bailey is more likely to have a bias towards interpreting medical evidence to deny claims that is stronger than an outside medical doctor would have. See, e.g., Moon v. Unum Provident Corp., 405 F.3d 373, 381-82 (6th Cir. 2005) ("[W]hen a plan administrator's explanation is based on the work of a doctor in its employ, we must view the explanation with some skepticism."). Second, Bailey's opinions are quite cursory. Third,

MetLife did not reveal Bailey's opinion to Plaintiff until she requested a copy of

the claim file after the appeals process was over. In its denial letters, MetLife

gave the impression of listing the evidence upon which it relied, yet it never

mentioned that it had obtained an opinion from a doctor. Fourth, the multiple

denial and appeal denial letters citing two different, though interrelated grounds,

are confusing, particularly in light of MetLife's failure to clearly explain its

reasoning.

### C.    Full and Fair Review

In opposing MetLife's motion for summary judgment, Plaintiff argues that

MetLife violated its obligations under ERISA to provide a full and fair review.

The Court agrees. Therefore, MetLife's motion for summary judgment is denied.

### 1.    MetLife's Obligation to Provide a Full and Fair Review

Under ERISA, MetLife has fiduciary responsibilities to discharge its duties

with respect to the Plan "solely in the interest of the participants and

beneficiaries," "for the exclusive purpose of [] providing benefits to participants

and their beneficiaries; and [] defraying reasonable expenses of administering the

plan;" and "with the care, skill, prudence, and diligence under the circumstances

then prevailing that a prudent man acting in a like capacity and familiar with

such matters would use in the conduct of an enterprise of a like character and

with like aims." 29 U.S.C. § 1104(a)(1)(A), (B). In order to fulfill these duties,

plan fiduciaries like MetLife must:

> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133.

> At a minimum, a notification of a denial of benefits

> shall set forth, in a manner calculated to be understood by the claimant—

> (i) The specific reason or reasons for the adverse determination;

> (ii) Reference to the specific plan provisions on which the determination is based;

> (iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; [and]

> (iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review;

29 C.F.R. § 2560.503-1(g)(1).

> One of the purposes of § 1133 is to provide claimants with sufficient information to prepare adequately for any further administrative review or for an appeal to the federal courts.  To the extent the statute is ambiguous, § 1133's disclosure requirements should be construed broadly, because ERISA is remedial legislation and should be liberally construed to effectuate Congress's intent to protect plan participants.

Brown v. J.B. Hunt Transp. Servs., Inc., 586 F.3d 1079, 1086 (8th Cir. 2009)

(citations omitted).

### 2.     MetLife's Failure to Provide a Full and Fair Review

The Court concludes that, when the denial and appeals process is reviewed as a whole, it is clear that Plaintiff was not afforded a full and fair review in keeping with the spirit of the requirements under § 1133.

First, MetLife's denial letters were a confusing amalgam of shifting bases for denial, particularly in light of Plaintiff's pro se status during the administrative process.  See, e.g., Rossi v. Precision Drilling Oilfield Servs. Corp. Employee Benefits Plan, 704 F.3d 362, 367-68 (5th Cir. 2013) ("Because [t]he purpose of section 1133 is to . . . ensure meaningful review of [a] denial [of benefits], and to be meaningful the review must contemplate the specific reasons for denial, it is impossible for the purpose of § 1133 to be fulfilled where the Plan

denied [the claimant] a full and fair review by changing its basis for denial of benefits on administrative appeal.") (alterations in original and citations omitted).

The Court acknowledges that, technically, MetLife did provide additional opportunities for Plaintiff to appeal when it shifted its reliance to a new exclusion.  However, as a whole, the appeal process was unclear and confusing. First, in MetLife's May 23, 2011, denial letter, MetLife relied only on the first exclusion as the basis for its denial.  Then, on August 17, 2011, MetLife appeared to affirm its denial based on the first exclusion but it then offered the alternative basis of the eighth exclusion and informed Plaintiff that she could again appeal. On October 25, 2011, MetLife sent Plaintiff a new letter purportedly denying her appeal based on both the first and eighth exclusions, yet also informing her that she had 60 days to appeal <u>that</u> decision.  Plaintiff again appealed, and on January 3, 2012, MetLife sent a letter purporting to uphold its denial but only identifying the eighth exclusion as a basis for the denial.  As is evidenced from this recounting of events, the multiple letters offered shifting explanations and multiple letters purported to both be deciding the appeal and, at the same time,

offering Plaintiff the opportunity to appeal the decisions made in that same

letter.

Perhaps, alone, a tangle of shifting bases and letters purporting to decide

appeals while simultaneously appearing to be initial denial letters subject to an

appeal right would be insufficient to find a violation of MetLife's duty to provide

a full and fair review.  However, additional factors appear in this case.

MetLife's denial letters offered bare-bones explanations for the denial.  The

letters listed evidence and documents upon which the decisions were

purportedly based, yet failed to even hint that MetLife had referred the matter to

a medical expert, upon whose opinion it primarily relied, let alone that the expert

was a MetLife employee who provided cursory and vague opinions.  (For

instance, when asked if "Coumadin alone [was] enough to contribute to the

death," Bailey stated, "I cannot say for sure." (ML 30.))  By providing scant

explanation for MetLife's decision and concealing that the decisions were based

on the opinions of a medical expert, MetLife cannot be said to have provided

Plaintiff with "[t]he specific reason or reasons for the adverse determination."  29

C.F.R. § 2560.503-1(g)(1)(i).  And it was not until the final appeal denial that

MetLife informed Plaintiff what type of evidence she needed to submit in order

to obtain benefits – evidence that the "laceration to the scalp . . . of and by itself was life threatening and would have solely caused his death." (ML 54. <u>See also</u> <u>id.</u> ("[E]vidence that this [laceration to the scalp] would alone [have] caused his death has not been presented.")  At that point, Plaintiff no longer had an opportunity to submit evidence to MetLife.

MetLife's failure to fulfill its obligations under ERISA constitutes more than a technical failure.  Plaintiff convincingly argues that, if she had known the basis for MetLife's decision and that it was relying upon a medical opinion that Coumadin and/or alcohol had contributed to Hall's death, she would likely have sought out her own medical expert to opine on whether those factors contributed to his death.  Given the nature of Bailey's opinions – they were cursory and far from forceful – it is likely that a contrary medical opinion could have been material to MetLife's decision.  Therefore, based on MetLife's failure to abide by § 1133, the Court denies MetLife's motion for summary judgment.

Generally, the remedy for a violation of § 1133 is remand, but, here, Plaintiff requests that the Court award benefits based upon the record as it currently exists.  Therefore, the Court now turns to Plaintiff's motion for summary judgment.

**D.     Plaintiff's Motion for Summary Judgment: MetLife's Coverage Determination**

Plaintiff requests that the Court grant summary judgment in her favor and award accidental death benefits.  Based on the record currently before the Court, Plaintiff is not entitled to summary judgment and an award of benefits.

### 1.     Whether Hall's Death Was an Accident

MetLife admits that Hall's death was accidental.  The question before the Court is whether MetLife abused its discretion in concluding that an exclusion applies such that coverage does not apply to Hall's accidental death.  The material dispute is whether his accidental death was "caused or contributed to by" the "treatment of [] illness or infirmity" (first exclusion) or "the voluntary intake or use by any means of . . . alcohol in combination with any drug, medication, or sedative" (eighth exclusion).   Because the denial is based on an exception to coverage, MetLife bears the burden of proving that the exclusion applies.  See Nichols v. Unicare Life & Health Ins. Co., 739 F.3d 1176, 1184 (8th Cir. 2014).

### 2.     The First Exclusion: Treatment of Illness Exclusion

As relevant here, the first exclusion provides that MetLife "will not pay benefits . . . for any loss caused or contributed to by . . . physical or mental illness

or infirmity, or the diagnosis or treatment of such illness or infirmity."  MetLife

argues that its decision to apply this exclusion was supported by the Plan

language and substantial evidence.  Specifically, it claims that Hall was taking

Coumadin as a part of his treatment of atrial fibrillation, a physical illness, and

the Coumadin contributed to his death by increasing his bleeding.  MetLife does

not argue that Hall's use of Coumadin contributed to the occurrence of the

accident – his fall.

> **a)  Whether Hall Was Taking Coumadin as Treatment of an Illness**

Plaintiff asserts that Hall was taking Coumadin for an upcoming

cardioversion, not to treat his atrial fibrillation.  The Plan does not limit the term

"treatment" to any particular type.  The common definition of "treatment" is

"'the action or manner of treating a patient medically or surgically,' and to 'treat'

is 'to care for (as a patient or part of the body) medically.'"  <u>Kutten v. Sun Life</u>

<u>Assurance Co. of Can.</u>, 759 F.3d 942, 945 (8th Cir. 2014) (citation omitted).

"[P]rescribed drugs or medicines,' as the words are commonly understood, are

forms of 'medical treatment.'  A doctor's given treatment plan may

simultaneously qualify as both."  <u>Id.</u> at 945.

35

The Court holds that, based on the undisputed evidence in the record, MetLife's conclusion that Hall was taking Coumadin as treatment of a physical illness was reasonable and supported by substantial evidence.  It is undisputed that 1) Hall had the physical illness of atrial fibrillation; 2) he was scheduled to undergo cardioversion to treat that atrial fibrillation; and 3) he was prescribed Coumadin by a medical provider to prepare for the cardioversion.  As the Eighth Circuit noted in <u>Kutten</u>, prescribed drugs are commonly understood to be a form of medical treatment.  Here, the Coumadin was a drug prescribed by a medical provider as part of a medical course of action to attempt to treat Hall's atrial fibrillation.

### b)      Whether Coumadin Contributed to Hall's Accident

MetLife has not asserted that Hall's medical condition or his use of Coumadin contributed to Hall's accident.  In other words, MetLife does not claim that Hall fell or was more likely to fall because he was taking Coumadin or because he suffered from atrial defibrillation.

Plaintiff discusses a number of cases in which courts have concluded that exclusions like the first exclusion at issue here do not apply when the insured's medical condition or treatment of a medical condition caused the accident, as

opposed to the death.  These courts have held, for example, that when an

insured's seizure caused the insured to crash his car, but the seizure did not

affect the seriousness of the injuries resulting from the car crash, the exclusion

did not apply.  See, e.g., Kellogg v. Metro. Life Ins. Co., 549 F.3d 818, 832 (10th

Cir. 2008) ("Here, the loss (Brad Kellogg's death) was caused by a skull fracture

resulting from the car accident, not by physical or mental illness.  While the

seizure may have been the cause of the crash, it was not the cause of Brad

Kellogg's death.  The Plan does not contain an exclusion for losses due to

accidents that were caused by physical illness, but rather excludes only losses

caused by physical illness.") (citations omitted); Orman v. Prudential Ins. Co. of

Am., 296 N.W.2d 380, 382 (Minn. 1980) (holding that similar exclusion did not

apply when insured suffered an aneurysm, which caused her to lose

consciousness and fall in the shower and drown because, while "the aneurysm

may have contributed to the accident, [] it did not contribute to the death [and]

[i]n such circumstances, the aneurysm is simply too remote to be deemed a direct

or contributing cause of death") (citations omitted).

The cases relied upon by Plaintiff holding that the exclusion does not

apply to accidents caused by illness or treatment are inapposite.  MetLife does

not claim that Hall's atrial fibrillation or Coumadin use caused his accidental fall. Rather, MetLife claims that the fall was accidental, but the effects of the fall were deadly because of Hall's use of Coumadin.

### c) Whether Taking Coumadin Contributed to Hall's Death

Plaintiff argues that the Plan does not exclude deaths caused by accidents under circumstances where an underlying medical condition or prescription medication taken to treat such a condition may have contributed in some fashion or increased the risk posed by the accident.  MetLife argues that exclusions, such as the first exclusion, "can reasonably be interpreted to exclude coverage if a noncovered risk, like illness, cooperated 'in any degree' with the accidental injury that resulted in loss."  Creno v. Metro. Life Ins. Co., No. CV–12–1642–PHX–SMM, 2014 WL 4053410, at *8 (D. Ariz. Aug. 15, 2014) (citation omitted). "Inversely, coverage exists only if the accidental injury, independently and exclusively of the infirmity, proximately caused death."  Id. (citations omitted). See also Murdock v. Metro. Life Ins., Co., No. 1:06CV02731, 2007 WL 6097205, at *6 (N.D. Ohio Dec. 31, 2007) ("The proper questions, framed in light of the Plan provisions, include only whether the femoral neck fracture suffered in the fall

was the sole cause of [the insured's] death and whether any pre-existing physical illness contributed to his death.").

The Court cannot say that MetLife's interpretation of the Plan language excluding "any loss caused or contributed to by" one of the listed exclusions is unreasonable.  See Manning v. Am. Republic Ins. Co., 604 F.3d 1030, 1041-42 (8th Cir. 2010).  Thus, the Court must next examine whether MetLife abused its discretion in interpreting the evidence in the record to show that, given the extent of Hall's injury, he would not have died absent the Coumadin treatment.  See, e.g., Viera v. Life Ins. Co. of N. Am., Civil Action No. 09-3574, 2012 WL 3194394, at *7 (E.D. Penn. Aug. 6, 2012).

Based on the current administrative record, the Court cannot conclude that MetLife abused its discretion in deciding that the first exclusion applied in this case.  Plaintiff has provided no medical opinion or other evidence to show that Hall died from the blow to his head, independent of the Coumadin therapy.  In other words, Bailey's opinion that it is "[u]nlikely that an otherwise healthy person would have exsanguinated as [Hall] did," and that "[t]he severity of his bleeding was likely from Coumadin" (ML 9) is uncontradicted.  Similarly, the record contains no evidence to contradict Bailey's conclusion that, within a

reasonable degree of medical certainty, Hall's death was caused or contributed to by a physical illness or the treatment for such illness, or alcohol in combination with any drug, medication, or sedative. (ML 10.) Moreover, the Medical Examiner identified Coumadin therapy as a contributing condition to Hall's death. (ML 270.)

### 3. The Eighth Exclusion: Alcohol in Combination with Drugs Exclusion

MetLife further contends that its denial is reasonable under the eighth exclusion for alcohol in combination with drugs. As relevant here, the Plan provides: "We will not pay benefits under this section for any loss caused or contributed to by . . . the voluntary intake or use by any means of . . . alcohol in combination with any drug, medication, or sedative . . . ."

There is some support in the record that alcohol in combination with Coumadin contributed to Hall's death. The toxicology results indicated that Hall's blood alcohol level was 0.20. Bailey opined that the alcohol "may" have increased the bleeding tendency of Coumadin and that alcohol "likely" decreased Hall's ability to seek help "if he was not incapacitated by the head injury alone." (ML 30-31.) This is not strong evidence; however, it is more than a scintilla. Plaintiff points to no evidence to contradict Bailey's opinion or to show

that Hall's blood alcohol level did not contribute to his death.  Nor does she

dispute that Hall's blood alcohol level was 0.20.  Therefore, the uncontradicted

evidence before MetLife was that Hall had a blood alcohol level of 0.20 and that a

medical provider opined that that level of intoxication may have increased the

bleeding tendency of Coumadin and likely decreased his ability to seek help if he

was not incapacitated by the head injury alone.  Based on this record, under the

abuse of discretion standard, the Court cannot grant summary judgment for

Plaintiff.

## V.    REMEDY

Based on the culmination of several factors, none of which alone is

necessarily dispositive, the Court finds that MetLife's denial of Plaintiff's claim

for benefits cannot stand because it failed to provide a full and fair review.

However, as explained above, the current administrative record does not show

that Plaintiff is entitled to benefits.  Because the lack of expert evidence in

Plaintiff's favor may be directly traced to MetLife's breach of its fiduciary duty,

remand is the appropriate remedy.

The Court remands this matter to MetLife to conduct a full and fair review.

See Brown v. J.B. Hunt Transp. Servs., Inc., 586 F.3d 1079, 1087 (8th Cir. 2009).

On remand, MetLife is instructed to clearly inform Plaintiff of the basis or bases for its denial, including listing the evidence upon which it relies in making its decision, and to then reopen the administrative record to permit Plaintiff to submit contrary medical evidence on appeal.

Accordingly, based upon the files, records, and proceedings herein**, IT IS HEREBY ORDERED**:

1. Defendant Metropolitan Life Insurance Company's Motion for Summary Judgment [Docket No. 13] is **DENIED**.

2. Plaintiff Kathryn L. Hall's Motion for Summary Judgment [Docket No. 16] is **GRANTED IN PART** and **DENIED IN PART** as follows: This matter is **REMANDED** to Defendant for reconsideration in light of the foregoing memorandum opinion.

3. Plaintiff's motion to strike certain footnotes in Defendant's opposition memorandum [Docket No. 28] is **GRANTED IN PART** and **DENIED IN PART** as follows: the motion is denied, with the exception that the Court will strike footnote the second and third sentences in footnote 5 and the entirety of footnote 24 in MetLife's Memorandum in Support of Motion for Summary Judgment [Docket No. 20].


Dated:   September 15, 2015          s/ Michael J. Davis
                                     Michael J. Davis
                                     United States District Court